We'll hear an argument this morning in Case 23-1275, Medina v. Planned Parenthood South Atlantic. Mr. Bursch. Thank you, Mr. Chief Justice, and may it please the Court. In our Federalist system, the legitimacy of Congress's exercise of its spending power depends on a state's knowing acceptance of funding conditions. As even respondents concede, an individual focus and mandatory language are not enough. Gonzaga held that clear, rights-creating language is critical to creating private rights. Congress did not use clear, rights-creating language in the Any Qualified Provider provision. Consider its text and structure. First, it does not use the word right or its functional equivalent, nor does it use words with a deeply-rooted rights-creating pedigree, like the Fifth Amendment's no person shall. That lack should be dispositive. Second, the provision speaks merely of obtaining a benefit from a third party, unlike traditional rights-creating language, which confers a right directly. Third, it would allow the regulated entity, here a state, to define the scope of the alleged right it is not allowed to violate by deciding which providers are qualified. Fourth, the provision does not reside in a Bill of Rights. It's one of 87 items on a list of planned contents that the Secretary must look for before approving a plan. Fifth, it is unusual to find a right in a substantial compliance regime where a sizable minority of beneficiaries may fail to receive the offered benefit. And finally, Congress knows how to clearly confer a private right to choose a provider, because it did so in FINRA's analogous provision, which appears in a separate Bill of Rights and uses rights-creating language connected to the beneficiary and directed to the regulated entity, a facility. It says, a nursing facility must protect and promote the rights of each resident, including the right to choose a personal attending physician. Congress did none of that here, and the Court should not read the Any Qualified Provider provision as though Congress did. I welcome the Court's questions. You seem to put quite a bit of weight on the use of the word right over, I think, 20 times in Tlaibski, and the absence of the word right in this case. Do you think right is absolutely necessary in order to determine whether or not a right has been created under this provision? I think if Congress wants to be clear, right is the best word, but we would take its functional equivalent. So, for example, entitlement or privilege, other words that are functionally equivalent to right, or, of course, the traditional no person shall, like the Fifth Amendment. But this Court made clear in Tlaibski that this is a high bar, it's atypical. And so if a state is going to be on clear notice, which it has to be to know what contract it's agreeing to, it needs to be really clear. So how would you amend this statute to be clear about a right? There's a number of things that Congress could have done. For starters, it could have set it apart in a separate bill of rights, like it did in Tlaibski with its Provider Choice provision. It could have used rights-creating language. For example, a beneficiary has a right to designate her provider. It could have taken the qualifications of the provider away from the state, the regulator, and instead made it a federal issue. Or it could have even done something like Congress did in 1396, small a, A84B, which if you move all the way down the list to near the end, it took the regulated entity, the state, it used a rights-creating shell, and it put them together in the provision. But none of those indicators of a clear statement is present in this provision. You're not quite calling it a magic word, but you're coming very close. And an example was raised in one of the briefs that says, the IRS must provide that any individual may obtain a refund of overpaid taxes. Seems hard to believe that that sentence on its face does not create a right for an individual to have a refund of overpaid taxes. Justice Sotomayor, let me address the magic words premise and then the IRS hypothetical. With respect to the premise, I'm not going to fight the court if you say that these are magic words. No, you would like us to, but assume that I don't want to. Yeah, that's a clear statement rule. That's what states need. But in the IRS hypothetical, there's a number of problems with that. First, as we point out on page nine of our reply, it could be clearer. But more important, the IRS provision is not a spending clause provision. It's not this conversation between a state and the Secretary of Health and Human Services about what must be done. It seems a little bit odd to think that a problem that motivated Congress to pass this provision was that states were limiting the choices people had. Some states were saying only state facilities would provide the benefit. Other states were identifying a more limited subset of providers. It seems hard to understand that states didn't understand that they had to give individuals the right to choose a provider. Justice Sotomayor, certainly a state would understand it has to provide a benefit. But absent clear rights-creating language, it wouldn't know that it had to honor a right. And I can make that same statement about what's important to people or what's significant about dozens of other provisions in 1396A. If you're talking about equal protection or the right to services, how about being reinstated on the Medicaid program after you've been in prison? There are countless things in that statute which people would consider important and vital, fundamental. None of those words actually appear in the anti-qualified provider provision. In your brief, you had eight provisions of the Act that were part of this same list of  provisions. And you said, if we recognize a private cause of action here, these eight are open to dispute. I looked at the eight very carefully, and there hasn't been much of a dispute among the circuits. There hasn't even been a challenge. You mentioned one of them because it's hard to see how a state can't understand it. There hasn't even been a challenge to it about providing Medicaid to juveniles in prison. And there's been no dispute over that because no one doubts that the state knows what it has to do. And it doesn't. The others, again, none of them have disputes. Some uniformly, courts have said, don't create private rights, and others, they have said they do. Where they say they do, to me, it's a simple issue. You have to provide a fair hearing before the state agency of any individual who claims coverage. Most states have a hearing of some sort. So I don't understand why that is important here. It's the difference between a benefit and a right, and whether this court is going to hold the line, as stated in Talevsky, that this is going to be atypical when Congress creates a right without using the so-called magic words. Could we talk about that, Mr. Birch, the difference between a benefit and a right? I mean, I assume from your answer to Justice Sotomayor, that you agree that the state has an obligation here. Is that correct? To provide benefits on the plan. But significantly... The state has an obligation to provide this particular thing, right, which is, the state has an obligation to ensure that a person, I don't even know how to say this without saying right, has a right to choose their doctor. That's what this provision is. It's impossible to even say the thing without using the word right. Has a benefit to choose their doctor? The state has to ensure that individuals have a benefit to choose their doctor? The state has to ensure that individuals have a right to choose their doctor. That's what this provision is. Well, that language that you're focused on, may obtain, is not clear rights creating language for four reasons. I don't want four reasons. I want you to answer my question. The obligation is to ensure that individuals can choose their doctor. And when we speak of that, the obligation is to, I mean, there's a correlative right. There's an obligation. There's a right. And the right is the right to choose your doctor. Justice Kagan, I won't go through my list. There's many reasons why that analysis is wrong. But simply because we understand colloquially that something might be a right, doesn't mean that Congress has put a state on clear notice that it could be sued in federal court under 1983 and subjected to liability and attorney fee shifting if it doesn't follow that provision, particularly in a substantial compliance regime. Well, here's what the state knows. The state knows it has an obligation. The state knows that that obligation runs to individuals and that individuals are specifically discussed in the statute. And the state knows the content of that obligation, which is that every individual has a right to choose their doctor. So what doesn't the state know that's important here? Whether it's going to be sued in federal court. If you know that you have an obligation and you know that the individual has a right to choose their doctor, that suggests that there's some kind of enforcement. Gonzaga makes clear that there's a difference between a duty to provide a benefit and a right that subjects you to 1983 liability. We would expect a provision like this to use individual because, of course, a doctor treats an individual. But the word individual can't be rights creating. It appears more than 400 times just in 1396A. That's hardly atypical. One of the benefits provided by the act is that you may choose your own doctor. If a person thinks that's not being provided, what remedies do they have? They have a very specific remedy if they are denied benefits. There's an administrative appeal process that they can go through. There is a separate remedy for providers who are disqualified. They also have an administrative appeal that could go through the state court system and that could come to this court if necessary. It makes sense that Congress would create the appeal right for the disqualification in the provider, not the beneficiary. I'm sorry. The Medicaid recipient can only sue a denial for services that were actually rendered. Yes. If a doctor can't render them, then they can't sue under that. That's correct. And the requirement of an administrative review process is not actually required by the act. It is something that a state can choose to give and they can choose its limits. Here they can only challenge, providers can only challenge a certain subset of disqualifications via South Carolina's administrative review process. They can only challenge a disqualification because of a criminal conviction or abuse. So the providers here did go through the administrative process and they were told they can't sue for this here. Justice Sotomayor, that is what they put in their brief. That is absolutely not what that regulation says. 126-404 says that those particular things that you mentioned, like a criminal conviction or recouping payments. So why were they denied here? Can I finish? They're not. But go ahead. Yeah. So first of all, those things that you mentioned, that gives them advance review before consequences take place. But the regulations make absolutely clear that they could raise anything that they wanted in their administrative appeal. And the reality is, they haven't pursued their administrative appeal yet. They went straight to court, they recruited a beneficiary, they filed their 1983 suit. The state responded to that with a brief in opposition to preliminary injunction motion and said, hey, your remedy, which you agreed in your contract was your exclusive remedy, is to go through the administrative appeal that we offer you. Mr. Grunge, can I just ask you, to what extent is the administrative appeal scheme relevant to the first step of this inquiry? What I'm a little worried about is that your argument seems to be conflating what had traditionally been understood and what we reaffirmed in Tlefsky as two different steps of the analysis in 1983. And the first relates to, to what extent is this provision unambiguously rights creating? And then the second step asks whether Congress has created some sort of alternative remedy or what is the enforcement scheme such that we might believe that 1983 is not available. So can you just help me to understand whether you're now suggesting that we evaluate whether this is rights creating, as we talked about in the first step, relative to an understanding of what Congress has done with respect to enforcement? To be clear, Justice Jackson, we are not making a step two C clamors argument. Never have. I'm not making it here. But as this court made clear in Gonzaga, that the remedies available can buttress the interpretation of whether there is clear rights creating language in step one. And that's what you said in the Souter decision in footnote 11 as well. And so we're using the provider's remedy and the lack of any beneficiary remedy to be able to challenge that provider's disqualification. That does seem awfully confusing. I mean, I, you know, there isn't a whole lot of indication that lower courts are confused about this. I looked very carefully at Judge Wilkinson's opinion. He lays out very clearly how this works and what we've said repeatedly. And I guess my concern is that the kinds of things, and I appreciate you had a long list of reasons why you think this isn't rights creating, but one of them had to do with the nature of this, you know, the enforcement mechanism. And I just see that as a step two concern. And I'm worried about us getting people confused if we start putting those considerations into the first analysis. Well, I think the analysis is distinct. If you're making a step two analysis, the argument is that the remedies are so comprehensive that it bars the ability to go to federal court. In step one, just like in Gonzaga, just like in Souter, the court is entitled to consider remedies like the fact that the disqualified provider has an administrative appeal to determine whether there is a right to go to court. And I would note that one of the reasons it's significant Congress gave that administrative appeal to the disqualified provider and not to the beneficiary is because the provider is the one who has all the information. Under respondent's theory, if a provider commits malpractice and they're disqualified for that reason, there's still a beneficiary right to go to federal court and bring a 1983 action. And that makes no sense because what does a beneficiary know about a provider's medical malpractice involving other patients? Can I just turn your attention back to what I understand to be the classic kind of step one inquiry here and get us back to Justice Kagan's point about the state being aware of an obligation to do this. And I note that although you suggest that it would be easier if the word right was in the statute, sorry, in this particular statute, 1983 itself talks about rights, privileges, and immunities. So even if we were to have a magic words test, it seems to me to be too narrow to just say that Congress has to say rights because we have in the 1983 concept in the actual text of the statute rights, privileges, and immunities secured by the Constitution and laws. So with an understanding of what 1983 was about, can you speak to why an obligation of this nature that runs to an individual in the way that Justice Kagan described doesn't get us sort of in the realm of rights, privileges, and obligations secured by the law? Yeah, two thoughts on that, Justice Jackson. First, we're not limiting this to right. As I mentioned earlier, entitlement, privilege, I would even spot you immunity because that's in Section 1983. I think any of those have the same rights-creating pedigree, but it is a high bar. An obligation is not enough. Telling a state that it has an obligation to do something or that it must provide something isn't the same as saying you have the ability to sue them in federal court and have 1983 fee-shifting opportunities. Well, it's not any old obligation. I mean, you're absolutely right, of course, that not any old obligation would be enough here. It's an obligation that runs to the individual beneficiary and that concerns an individual beneficiary's entitlement to choose something. And once you're at that, you're at a right. And you know, if the language in the statute said right, as it did in Tlefsky, you would still say, oh, well, the state doesn't know that that right is enforceable. What this language does is the same thing that the rights language does. It says you have an entitlement. It's your option to choose a doctor. Now, you know, we've never said, oh, and the statute has to say, and this can be enforced in court. May I respond? Yes, sure. Justice Kagan, what you said in Tlefsky is that you need rights-creating language with an unmistakable focus on the benefitted class. So the fact that you identify individuals and that they're... This is an unmistakable focus on the benefitted class. The benefitted class is Medicaid beneficiaries who have the right to go see the doctor of their choice. That's what this provision is. But, Justice Kagan, it's missing the connective tissue to the rights-creating language. You need clear rights-creating language that the beneficiaries are subject to and that is directed to the regulated entity here at state, and all of that connective tissue is missing because there are no clearly rights-creating words in this statute. If you would lower the bar, those provisions that we would mention in our brief are just the start. That's already 10 percent of Section 1396A. The atypical high bar that you articulated in Tlefsky would be abandoned, and courts will continue discovering rights in all kinds of statutes. Thank you, counsel. Justice Thomas, Justice Alito, anything further? Justice Gorsuch? In the administrative review process, your friends on the other side say it would be futile because it's controlled by the state. Thoughts? The state gives a full de novo review to a disqualification decision that's clear on their website. It's clear in the administrative rules that govern that proceeding. Yeah, but they also report to the governor, right? They do, but let's say you get a bad decision there. You've got an appeal right to the state courts, and you've got an appeal right to this court. So it's a remedy that is fulsome and allows them to make any argument they want. You emphasize Gonzaga and Tlefsky, but we have other cases, too, Wilder, Wright, Blessing. Thoughts about our jurisprudence in this area? I do. Obviously, Gonzaga and Armstrong have cast a lot of shade on decisions like Wilder, Wright, and Blessing. And I noted that in the Tlefsky decision, this court did not use any of those cases to reach its conclusion in that case. But the problem is that the lower courts are still in a state of confusion about what the status of those cases are. So, for example, in Tlefsky, I believe Mr. Chief Justice asked a question. The counselor observed, haven't we put a stake in Wilder? Well, outside the walls of this courtroom, lower courts have not gotten that message yet. Otherwise, Judge Wilder and his concurrence would not have said, well, we're still bound by Wilder and Wright and Blessing until this court says that those are actually dead cases that we should no longer follow. The problem with a case like Wilder is that the standard it applies is so low. Wilder says the inquiry churns on whether the provision was intended to benefit the putative plaintiff. Well, that kind of sounds like the test that Justice Kagan is propounding this morning, where you don't need rights-creating language. But if that's the case, there is no high bar, there is no atypical case, then the federal spending clause statutes are replete with private rights that can be enforced in federal court. Justice Kagan? I think you gave me the option already. Oh, I'm sorry. Justice Kavanaugh. We're here, obviously, because of the confusion in the lower courts, which has been kind of a 45-year odyssey. Yes. And it's not the fault of any one judge, but collectively this court has failed to give guidance, obviously, that lower courts can follow, that states, providers, and beneficiaries can follow. So one of my goals coming out of this will be to provide that clarity. Your word, right, or its functional equivalent, that or its functional equivalent strikes me as some of the questions have revealed potentially lacking the clarity that I hope we can provide one way or the other going forward. So don't you think it would be better to actually tell us the words that are rights-creating rather than having something like or its functional equivalent, which could be another decade of litigation? That's certainly possible, because you'd have to keep that to a pretty small class. I wouldn't be able to really do any better than Justice Alito's partial concurrence in Tlaibsky, where he describes it as explicit rights-creating language. And the list I would give you is rights, entitlement, privilege, and immunities. When you're using the word... That's it. You could define it as that universe. I don't think that's a magic word, but if it is, then it's a clear instruction... I'm not allergic to magic words, because magic words, if they represent the principle, will provide the clarity that will avoid the litigation that is a huge waste of resources for states, courts, providers, beneficiaries, and Congress. Right, exactly. And so when Justice Kagan was bringing up the may obtain phrase, if I could just quickly talk about that, may obviously has its own ambiguity. It's not even clearly mandatory, much less having a rights-creating pedigree. When you pair it with the word obtain, may obtain is even less rights-creating, because it's not giving anything directly to anyone in explicit terms. It's odd that the alleged rights scope is defined by the state, which is the gatekeeper, to determine who is a qualified provider. And then, of course, all of this is subject to the substantial compliance provision. And so, so long as this is in the plan, the state can administer it any way it wants. And if the secretary doesn't complain if they don't honor any of the provisions, any one of the provisions, then there's no penalty for that. So you can see how quickly, once you move away from those core words, like right, entitlement, privilege, immunity, that it's easy to cascade and find rights in any provision that mentions individuals and a benefit. Like that's the problem I think you're trying to solve. And if this court doesn't toe the line, if it doesn't have the high bar, the atypical, not 10% of 1396A, you're going to be seeing these cases for the next decade easy. I mean, every term we could have. And your response, you said this, but I just want to get it nailed down. Your response to the idea that those words, those terms you've given us, create an artificial divide between provisions. Well, it's not artificial because if we step back and think about this, this is a state entering into a contract and it knows that it has to provide benefits. We've talked about that. The question is whether it's on notice that there is a private right that can be enforced in a section 1983 action with attorney fee shifting, where all of a sudden money is flowing into attorney's pockets instead of into the beneficiaries who are supposed to be getting the benefits of the congressional appropriation. So if you don't limit it to those few words, then all of a sudden you've got the flood gates are open. And I know their contention is, well, there is no real flood gates. Well, we've cited circuit case after circuit case about all kinds of different provisions. In the context of the any qualified provider provision alone, we're talking about 9,000 providers who have been disqualified across the country, any one of whom, if you rule in favor of respondents, can recruit a beneficiary and go to federal court and then line their pockets with the attorney's fees. So I think your instinct to try to keep this as clearly defined and as narrowly defined as possible is consistent with putting the state on notice, which is the whole purpose of this spending clause exercise. And last point, on the clarity, you think we need to say something specific and explicit about Wilder and Blessing, I guess. I didn't think you did after Tlaibsky, but when this case was GBR'd and Judge Richardson says, what are we supposed to do as lower court judges when the court doesn't say explicitly don't follow Wilder or Blessing or Wright anymore? I think you do need to be more clear. If you really want to put a stake in those cases, you're going to have to do it in writing just like you did with Lemon. Thank you. Justice Barrett? I'm going to ask you a little bit about Justice Jackson's question about how the availability of alternative remedies in a C-Clamor sense might bear on step one. Is it totally irrelevant or would it affect the bar in some way? And this is how I'm thinking about it. If you do have some alternative scheme, and it might, under C-Clamors, you might say, listen, that scheme isn't complete enough, that Congress was directing something only to that. But wouldn't the presence of a scheme cut against, I mean, would it adjust the bar, the amount of clarity that has to be showed at step one? Because if there is some scheme, some method, mechanism by which the beneficiary can challenge the state's denial of her ability to seek the provider of her choice, I guess it doesn't seem like it's completely sealed off is a different question. Do you agree? Or how should I think about it? Yeah, I agree. And I think that's exactly what the court did in Gonzaga, where it said that the available remedy there, you could go to the federal government and register a complaint, buttressed the analysis that there was no clear right created in that FERPA provision. And I think it's the same thing here, where you've got a provider remedy, and you've also got a beneficiary remedy that does not involve reinstating the provider. That's exactly the kind of clarity that should make the bar even higher. No, but the beneficiary remedy is, just as Sotomayor pointed out, that's if your claim is denied, right? So then that's the beneficiary taking the risk, going to the provider she wants to see, and then potentially having to pay out of pocket, right? Well, it's a little bit different than that. If she's denied up front, say she applies to be a Medicaid recipient, and she's turned down, she could appeal that decision. It's really about the status of her ability to get Medicaid benefits, or whether a particular procedure is covered. But it's significant, we think, that Congress gave the beneficiary the right to challenge what the beneficiary has personal knowledge of, her care. And it gave the provider the right, what the provider is familiar with, the reasons why they were disqualified. Well, Mr. Burch, I mean, like, don't you think, you know, if I want to go see Dr. Jones, and Dr. Jones, that's the provider of my choice, and the state has disqualified Dr. Jones, and as Justice Kagan points out, you know, the statute says, may obtain the benefits. There's no mechanism, am I right, for the beneficiary to say, well, you're depriving me of my ability, we won't call it right, we won't use the loaded word, but my ability to see the provider of my choice, and nobody's disputing that Dr. Jones can provide the services in a competent way that I want to have. Well, in a sense, what all that means is that the beneficiary doesn't have the ability to whip out a magic wand, and then just hit on the head the doctor that they want, and then they must be qualified under Medicaid, and this is getting a little bit more into the question of what's qualified, but that's not the right, the way that the statute conceptualizes this, is it's like when I go to Blue Cross and Blue Shield, and I don't get to pick any doctor that I want, if I want to go to Johns Hopkins, I can't request a doctor unless they're on the list, and this, any qualified provider provision works the same way, the state decides who the providers are who are qualified, and you get to choose among them, and they decided that Planned Parenthood was unqualified for many reasons, chiefly because they're the nation's largest abortion provider. What about substantial compliance? So, do you conceive of substantial compliance as giving the state a little bit of wiggle room to maybe not be entirely in compliance, and if so, how does that really affect the step on the Gonzaga analysis? Yeah, absolutely. So, substantial compliance says that everything has to be in the plan, but when the state administers the plan, it doesn't have to meet 100% of every jot and tittle in the statute, and if they start to deviate in any way, they don't enforce this provision, or they modify this provision, there's experimental flexibility in there, and the secretary is the one who makes the call. He or she says, you've gotten so far out of whack, I'm going to withhold some or even all of your funding, but as long as the secretary's happy, they can continue on their path. How does that bear on whether it's rights creating language? Thank you for that follow-up question, Justice Barrett. It's because if you have a right, it's something that can't be taken away, and so in a context where the state can not be following or administering that provision at all, and the secretary can say, no harm, no foul, that's the exact opposite of a right, and that's why this structure, in addition to the language, makes it so clear that this is not a right. Justice Jackson? So was there an administrative appeal process in the Tlebsky scenario? In the Tlebsky scenario, there was an ability for someone to register a complaint with the federal government. So there was a process there, and yet we still held that there was rights creating language. Oh, sure, because you had a separate bill of rights that mentioned the word rights two dozen times, and that rights creating language... It's not about whether or not there's actually an appeal process. It's about, again, your magic words. You have to say rights. Well, I don't want to offend any justice. We're fine with a magic words test, if you want to do that, because then it would be clear. I'm trying to evaluate the import of the separate appeal process. You're saying in a situation in which Congress has used the word right, it doesn't matter. It's just one of many factors, and so in Tlebsky, you had a separate provision. It was a bill of rights. You had the word right, and most importantly, there was the connective tissue where that rights creating language, the beneficiaries were the subject of that, and the states were directed to follow that. I'm sorry, the nursing facilities. All right, let me ask you about clarity in Justice Kavanaugh's argument. So you indicate that you believe that lower courts need greater clarity, but we took this case on the basis of a pre-Tlebsky split. So as we sit here today, we actually don't have any idea what the lower courts in the state are doing post-Tlebsky, and I'm looking at Judge Wilkinson's opinion in this case, and he seems to have a pretty good sense of what our cases mean. I mean, he goes through all the cases, summarizes the evolution of our case law from Wilder to Blessing to Gonzaga to Tlebsky. He explains in a very nuanced way how each case refined the test for Section 1983 enforceability, and I understand you disagree with how he's applied what the test is in this situation, but is there any part of his summary of the cases and where we are in terms of the evolution of the law that you disagree with? A number of things, as you might expect.  Judge Wilkinson cites Blessing. He cites Wilder cases that this court did not rely on in Tlebsky, but as Judge Richardson points out in his... No, he cites and explains how we've moved. So now, he had this case, this case that we are looking at today, both before and after Tlebsky. Before, he says, 1983 writes, creating language, you're fine. Tlebsky comes down, we GVR, which we standard practice when there's an intervening opinion. He reads Tlebsky, and he says, ah, this actually confirms what I understand the law to be, and he explains very clearly how we get here, what the analysis is, and what the test is today. So I guess I don't understand what the remaining confusion is. And certainly, we're only two years out from Tlebsky, so there is no confirmation that lower courts are still confused about what they're supposed to be doing now. Two very specific responses to that, Justice Jackson. First, he did not eschew the cases that this court was no longer using. That's the confusion we were just talking about. But more important, he didn't understand the clear or explicit or unambiguous rights creating language component of the test. It's exactly what Justice Kavanaugh was describing. So you just disagree with what he says, but it's not like we need to go back and revisit the old cases. We've arrived at this point. You think he's getting it wrong. I totally understand that. But it just seems to me odd that we would, you know, wind back the clock many, many years and talk about what these old cases said when we've all agreed that we've evolved to this current point. I don't think you need to go back, other than to make clear, to help judges like Judge Richardson to know what cases are still good law or not. All right, let me ask you another question. To what extent? Could I just finish? Yes, please. But the important thing is, Judge Wilkinson doesn't get the explicit rights creating language. It's not just a misapplication. It's a misunderstanding of the test. When he looks at 1396A and sees that a plan must include these things so the Secretary can approve it, he thinks that that's a directive to the state, and it's not. He looks at words like may obtain or the fact that the statute references individual and thinks that's clear rights creating language, when it's not. All right, so you disagree with him. Let me ask you about the part of your list of things related to whether or not this is rights created language that relates to the fact that this is part of state plan requirements. I guess you say that's one indicia of it not being rights created. But I guess I'm looking at Section 1320A2 in the statute, which applies to the Medicare Act, which Congress enacted in response to our decision in Souter, which had said a similar thing. Souter had held that a Social Security Act provision was not privately enforceable because it appeared in the list of state plan requirements. In response to that, Congress enacted a statute that specifically says, quote, a provision is not deemed unenforceable because of its inclusion in a section of this chapter requiring a state plan or specifying the contents of a state plan. And that provision is applicable to the Medicare statute. So if we take into account or give any weight to the fact that this is in the listing of a state plan, aren't we doing exactly what Congress has told us we're not supposed to do? No, because the key phrase in that statutory first sentence that you read is because of. And we know that's a but for. And so what that means is when a provision is simply on a list, that can't be the standalone reason why it doesn't create rights. But that's the reason we can take into account as to why. Just like the plurality in Armstrong. Absolutely. 20 years after that statute was adopted. And we're not just relying on the list. Congress has made it clear that we're not supposed to do that. You have to. The statute would have to say you can never look at this as a factor in determining whether or not. Yes, that's very different than because of. And so, of course, we're not just relying on the 87 list. We're relying on the fact that you have a whole list. I'm just trying to understand the extent to which this factor is consistent with the will of Congress. Thank you. Thank you. Thank you, counsel. Mr. Hawkins. Mr. Chief Justice, and may it please the court. The text, context and structure of 823 confirm that it does not create a private right. Starting with the text, 823 lacks the unambiguously rights creating language we saw in the FINRA statute in Tlefsky, which used the word right nearly two dozen times in its own Bill of  And read in context, 823 is part of a conversation between the federal government and the states. It's buried deep among 86 administrative provisions arranged in no discernible order and directed to a plan administrator and the HHS secretary. Structurally, it's part of a substantial compliance regime, which, as Gonzaga recognized, shows a concern with compliance only in the aggregate. That's not usually how we think of rights. On top of that, 823 compliance can be waived by the federal government, which makes the creation of a right all the more implausible. Finally, 823 includes multiple enforcement mechanisms of its own, including state administrative remedies subject to judicial review and the denial of funding. Tlefsky emphasized that rights creating statutes are atypical, but this is a run-of-the-mill spending clause statute and holding otherwise would invite line-drawing problems. I welcome the court's questions. What do you think is left of Wilder and Blessing after Tlefsky and Gonzaga? Well, Justice Thomas, we think that the star footnote in the Armstrong decision effectively overruled Wilder. It specifically said that Wilder was repudiated. We think that's functionally the equivalent of saying overruled. And it didn't mention right by name, but we think right and Blessing are no longer a good law either. I heard my friend, counsel for Petitioner, note the confusion in the concurring opinion below about those cases, but I thought it would have been clear after Armstrong. Mr. Hawkins, you talked a lot about the structure of the statute and the fact that this is one of 87 and so forth. And we heard that argument some years back in the Souter case from the government and the court accepted it and Congress did not. Congress came right back and passed an amendment and said the fact that this is listed in this big 87 item list should not be thought to have anything to say with whether something in that list is a right. Not everything in that list is a right, but the fact that it's in that list is pretty irrelevant to the question of whether something is a right. Respectfully, Justice Kagan, I don't think we read 1328-2 quite the same way. I think we're effectively aligned with Petitioner on this, that because of language is creating a but-for requirement, it's saying that the sole reason cannot be that it appears in this list of plan requirements. And we think that's the best reading because that's consistent with Gonzaga and the sort of... Yeah, I would have thought that if Congress goes to the trouble of passing the statute, what Congress was looking at was like, oh, you know, we agree with their result in Souter, but if we look at their reasoning, I mean, it was a very kind of nuanced way to react to our decision. We look at their reasoning, and if their reasoning is that it was on this list, we want to say that that should be no part of anybody's reasoning, because we think that there are things on this list that are rights, and we want to make sure that in the future, when those other things come up, that the court doesn't do the exact same thing. That was the whole point of the Souter fix. Well, Your Honor, we think that the best reading of it is that Congress said we don't want that to be the only reason the court said it. That wasn't the only reason in Souter. There was a central argument in Souter that the standards set forth were not intelligible, which is part of our review. So I'm not sure how we can read the Souter fix as a don't use this only fix approach. Well, Your Honor, 1328-2 also notes that it's not disagreeing with the outcome in Souter, and I think the best way to interpret that is saying this can't be the sole reason. And I think I heard my friend mention the Armstrong plurality. I mean, I think it's worth noting that 1328-2 was briefed in that case, and the Armstrong plurality nevertheless reached the conclusion that it did, that the inclusion in this plan list was a relevant consideration. And as I said earlier, I think that does flow fairly from Gonzaga. Now, for 20 years, the government took the position that the free choice of provider provision was enforceable via Section 1983. You now say that Tversky made you change your mind. But I'm confused by that. I thought Tversky just reiterated that Gonzaga analysis governs Step 1. So you took the position, the same position after Gonzaga. Did you need a hit over the head? Or? Well, respectfully, Your Honor, I think we note in our brief that with the— Meaning, did you need for us to say it a second time before you understood it? Or— Your Honor, as we note in our brief, with the change in administration, the federal government re-evaluated its position in this case, and we believe that the view for advancing today is the best reading of the statute. Now, the government takes the position, as have many, that for spending clause legislation, that the remedy is only that of Congress, of the agency withholding money from someone who violates its provisions. It does seem awfully odd to think that that is a remedy at all, because what you would be doing would be depriving thousands of other Medicaid recipients of coverage in a particular state over the fact that an individual has been denied something that the provision says they're entitled to. Is there much sense in that? Well, you— If you have something, as Justice Kagan said, is an individual obtaining a privilege of choosing its provider, why would we say that because it's spending clause, somehow, the only remedy is suspension of benefits? Well, Your Honor, I guess a couple things. I mean, first, that's been the basic spending clause framework since at least Pennhurst and maybe going even farther back. That's typically how any spending clause statute works. The question is, you don't disagree that there's no magic word formulation for a right. And I assume in your brief that you accepted that may-obtained formulation could confer rights depending on the circumstances. Here, you say the circumstances don't. But why can't or why shouldn't we take into account that the Act itself doesn't provide a mechanism for redress by the recipient or by the provider, that the states are free to put in state administrative remedies, but they don't have to by the Act? So wouldn't a circumstance like that inform someone that it's a right that the individual should be able to enforce in court? Well, I guess there were a few parts to that, Your Honor. Let me see if I can hit all of them. First, you mentioned the may-obtained language. What we're trying to indicate in our brief is that we don't want to foreclose the possibility that somewhere, someday, Congress could enact a statute that used a phrasing like that to create a right. I mean, it's difficult to predict the future. The Bill of Rights does it all, doesn't it? Sorry, Your Honor. The Bill of Rights itself does it. No person shall, and then it says, no state may. The Bill of Rights doesn't use the phrase may-obtain. Mr. Hawkins, may-obtain in this language is just to say, I mean, a person doesn't have to go see a doctor. It's the person may go see a doctor, but it's of their choice. The may has nothing to do with the question that we're talking about now. The may is just like, you don't have to see anybody if you don't want to. I respectfully don't think that's the best reading of the statute. I mean, we're looking for unambiguous rights-creating language, and I think that our problem with may is that it's inherently ambiguous. It's usually used to create permission, and I think there's a difference between permission and the right. I mean, the may is just, you may see a doctor. We don't expect that-we're not forcing people to see doctors, so that's the way the may functions in the sentence. Well, if that's right, Your Honor, I think that would be unique. I mean, in Respondent's Brief, I don't think I saw one example of any federal statute anywhere that creates a right using the phrase may-obtain. It's just not something that has that sort of, I think I heard my friend say, like a rights-creating language. Can I ask about this idea that you have to say right or entitlement, or what was the other words that-privilege? Privilege is sort of not a right, but okay, right, entitlement, or privilege. I mean, this is kind of changing the rules midstream, isn't it? Congress wrote this statute a while ago, and if we come in now and say you have to use one of these three words, I mean, that's good going forward for the statutes Congress wants to write in the future, but it's not a fair way to interpret statutes that Congress passed many moons ago, and that then Congress amended by way of the suitor fix to say, you know, by the way, that list of requirements for the state plan, we think that there are some rights in there. May I answer the question, Mr. Chief Justice? Yes. So I think this came up in Alexander v. Sandoval. I think it's page 288 of that opinion. The court recognizes that we evaluate older congressional laws through modern jurisprudential lenses. I believe Justice Stevens' dissent objected to that, but the majority nevertheless concluded that that's the appropriate framework to evaluate congressional statutes, and indeed, I believe that happens in other contexts with statutes going back much farther. Thank you, counsel. Justice Thomas? Justice Alito? Justice Kavanaugh? I just want to isolate the role of the alternative enforcement mechanism in your analysis. Could a term be rights enforcing if there's no alternative enforcement mechanism, but the same term be not rights enforcing if there is an alternative enforcement mechanism? Justice Kavanaugh, I guess I'm trying to think of an example where that would be true. I guess I have to answer the question, yes, because it's hard to know how that would play out in any given statute. I mean, we know from Tlefsky that we look at terms as they're situated in structure and context, so we're always taking structure and context into account. So are you saying that a statute without an alternative enforcement mechanism is more problematic in your analysis? I think that is what you're saying. Well, we do think that the alternative enforcement mechanisms here, I think buttress is the word that's used in Gonzaga. That's why I'm trying to isolate the role in your analysis, and maybe you're saying you can't do that. Yeah, so I do think that it's relevant. I don't know that it would move the needle here. In this particular case, if there were no back-end remedies for providers who are excluded, I still think we're missing the clear, unmistakable rights-creating language directed at a specific party that has specific duties as to specific people. And since we're missing all of that, I don't think the back-end remedies matter. But I think the fact that we do have the back-end here reinforces our conclusion on the front-end. Do you agree with Petitioners' Counsel on the universe of terms that you think are usually or always rights-creating? Well, Your Honor, I don't know that I've got a specific comprehensive list. I mean, I think I heard my friend say the word right. I think I heard entitlement.  I think I heard privilege. And immunity. Yeah, those all sound right. Well, if you don't, you come up here and you say, you know, we're concerned about line drawing problems, but you're not. What's the line exactly? You want us to do a line. Well, tell me what the line is. Sure, I think those three words would count. Looking at Title VI and Title IX, you know, no person shall be subject to discrimination. I think that gets the job done as well. Maybe a helpful way to think about it, Justice Kavanaugh, is we're looking for words that have a real rights-creating pedigree in our nation's history and legal traditions. Well, I think Justice Kagan's raised good points about how once you open it up like that, there are going to be line-drawing problems. You're not going to solve the issue that you came here to solve. Well, Your Honor, I don't know that there's a way to avoid line-drawing problems without saying that we need the word right and exclusively right and nothing else. And I don't think— Well, right at the beginning, you said you wanted to avoid line-drawing problems. Well, I think that the court could avoid a lot of the difficult cases by making clear, as it said in Tlesky, that we're looking for atypical language with this clear rights-creating pedigree. The minor amount of cases are not going to clear that bar. There may be a few that do. Thank you. Justice Barrett? You might not know the answer to this, but I'm just wondering about the consequences of saying that this cause of action can be brought under 1983 here. I mean, so both you and your friend have talked about the possibility that many other statutes and many other provisions then might be understood to be enforceable through a private cause of action. But what about this one? I mean, how—I mean, so here we're here because of Planned Parenthood not being a qualified provider in South Carolina. But would people—like, would this open the floodgates of people bringing 1983 suits because they can't see the provider of their choice? Or is this kind of a pretty unusual circumstance? Well, Your Honor, it's hard to say it's unusual. There have been a number of lawsuits in a number of states about A23 in specific. I think it's the most litigated provision within 1396A. Is it all about abortion providers? No, I don't believe so. I believe there have been other instances. I believe—I'm worried about my speaking. I think one out of the Seventh Circuit didn't involve abortion providers. It was in another context. We're not resting on any particular floodgates argument. Oh, I didn't mean to suggest that you were. I was just wondering. Okay, thank you. Justice Jackson? Yeah, three quick points. Just clarifying in your response to Justice Sotomayor about what motivated the government's change of position here. I heard you say it's the change in administration that caused the change in position, not necessarily anything new or different in Tlefsky. Is that right? Well, Your Honor, we think that the Tlesky approach, in Your Honor's opinion for the court, gives us more confidence in the position that we're advocating. I understand, but you don't see daylight between what Tlesky was saying and what Gonzaga said, which is what the Bush administration and many, many other prior administrations relied upon in reaching the opposite conclusion here. So I think Tlesky does a couple of things that maybe reinforce what Gonzaga said in a way that helps think through the issue more clearly. I mean, number one, Tlesky emphasizes that these statutes are atypical, so we're looking for the atypical situation, not the run-of-the-mill situation. And second, in Your Honor's opinion for the court, I think it's in Part 3-2, it's noteworthy that it begins looking at the overall placement of the text within the structure, within the statutory structure, and we think that that's an indication that it really is important to marry text, context, and structure all together, and when we do that here, it's not just about looking at words in isolation, but looking at the big picture. All right. Can you point me to the section in your brief that endorses any particular words or bright line rule? Well, I was kind of struck because I thought that was the difference between you and Stratishner. When I read your brief, I didn't take the United States to be adopting that kind of text. So you're saying something different here at the podium than you were in your brief. Oh, I don't think I mean to, Justice Jackson. So the United States is on all fours with the idea that we need to tell Congress exactly the words that have to be used in order to create rights. Well, I think what we've argued in our brief and what I certainly mean to argue today is that we're looking for unmistakable rights-creating language. I think that's what we say in our brief and in our conversation this morning. We've elucidated some ways that Congress could do that, and I think that's consistent with what we've been saying. All right. Finally, has, to your knowledge, HHS ever withheld Medicaid funding from a state for violating this free choice provider provision? I mean, to the extent that we're talking about, you know, ways of enforcing this particular provision, it would be helpful to know if there is an actual alternative here. Your Honor, we don't know of any instance in which funding has been withheld in connection with A23. We noted in our brief that we have denied plan modifications for failure to comply with A23, but as to funding, we don't have an example of that happening. I wouldn't read too much into that. Again, this is a substantial compliance regime. We've been concerned with compliance in the aggregate, and the lack of funding denials I think suggests that states are complying in the aggregate. Thank you. Thank you, Counsel. Thank you, Your Honor. Ms. Zaharsky? Mr. Chief Justice, and may it please the Court, as this case comes to the Court, it is established that South Carolina violated the statute by denying Julie Edwards her choice of a qualified and willing provider. The only question is whether she can do something about it to sue under Section 1983. She can, for four reasons. First, look at the text. It refers to individuals, any individual eligible for medical assistance. It gives them a right to choose their own doctor. They, quote, may obtain such assistance from any qualified and willing provider, and it's  The state must do it as part of the federal-state bargain. This language satisfies the standard that the Court set out in Gonzaga and Teletsky. It uses mandatory, individual-centric, rights-creating language. The only thing it doesn't do is use the word right, and this Court has repeatedly said that magic words aren't required. Second, look at the context. Congress took this language from Medicare, which uses the same operative text. That text makes clear that it gives an individual the right to choose a provider. It's titled free choice by patient guaranteed. The family planning provision, which comes right after the language at issue, confirms that this is a protected choice. The state, quote, shall not restrict the choice. Three, there's no doubt about what Congress was trying to do here. It enacted this statute because states were artificially limiting the providers in Medicaid, and that's the same thing that the state is doing now. And Congress made this an individual right because it recognized that when the state does that, it hurts individual patients. It is the individual's right. It is not the provider's right. And fourth, there is no alternative federal remedy. There is no way for individuals to challenge the state's decision to deny them their provider of choice. There's no federal cause of action. There's no administrative remedy. Congress expected that an individual would be able to sue, in the rare instance when a state is keeping a needy patient away from a qualified and willing provider. If the individual can't sue, this provision will be meaningless. I welcome the Court's questions. Do you think that rights-creating language under the enumerated powers is different from the language required under the Spending Clause? Well, sir, the Court has said in Spending Clause cases that the Congress has to speak unambiguously, but at the same time, there's many cases in which the Court has required clear statements from Congress, and it has said we don't require magic words from that. Our job is to figure out what did Congress intend. So we look at the words that Congress enacted and figure out what Congress intended. And I think the way that you can tell that the word right is just a magic words test here, I think, from my friends on the other side and why you don't need it, is because the statute here would do the exact same thing if it said the word right as opposed to what it says now. So how would this, if it's more demanding under the Spending Clause, how would the statute differ under the Commerce Clause? What language would you use if it were, if this right were created under the Commerce Clause? Well, I think it creates a right either way. I think there's, Congress can write statutes. Well, I'm talking about the language. If it's more demanding and it's atypical, what language that we have, what language that we have here, you would not need in the Commerce Clause. Well, first it's talking about a state obligation and it's something the state must do to participate. So it starts by saying that it's a mandatory obligation. Second, it says that there's any individual may obtain care from any qualified and willing provider. So it's a combination of any individual may obtain care from any qualified and willing provider. It disables the state from doing something the state might otherwise want to do. Like, we, you know, we want to take this provider out of Medicaid for a reason that's unrelated to medical qualifications, which is what the state is doing here. And so it's just the combination of this language makes clear what this provision is doing. I don't think anyone disagrees what this provision is about. Do you think that language is more exacting than would be required under the Commerce Clause? I don't, I'm not certain. I think the court has said that in the Spending Clause context that Congress needs to speak clearly. My point is just that Congress has spoken clearly here because it has used what this court requires. The court says we want to look to see if there's individual-centric rights-creating language that imposes a mandatory obligation. The court has never said it has to say the word right or it has to be magic words or anything like that. And just to pick up on this idea that, you know, we heard maybe for the first time today that there are only certain magic words that count, you know, there's some real problems with that from a separation of powers perspective. Congress writes statutes. It's this court's job to interpret them and figure out what Congress intended. And here it's not like Congress just wrote this statute, you know, 50 years ago and nothing has happened. Congress has come back when this court has interpreted the statute in a way that the court thought, that Congress thought was inappropriate with the suitor fix. And that's a case where as one of the factors that was considered for whether language created an individual right, not the sole factor, but as one of the factors, this court said in the suitor decision, we see that it's part of the state plan requirements. And Congress came back with language that I think was quoted by one of the justices that said, you know, no, that can't be a reason why because- I'm sorry, finish your sentence, please. It just can't be a reason why. Okay. Do you think our opinions in Kalevsky and Gonzaga narrowed Wilder in any way? Well, the court didn't mention Wilder. Is that a way? Well, I think the court made clear in Gonzaga that to the extent that Wilder could be read in a certain way, which is to readily imply individual rights and not to require unambiguous rights conferring language, Gonzaga says, don't read Wilder that way. And so I thought that was clear in Gonzaga. And then in Kalevsky, the court said, we are using our established test, which was centered in Gonzaga. So I think that Gonzaga is the one that explains that to the extent that Wilder had this- didn't require an unambiguous conferral of an individual right, that that was wrong. At the same time, the court has re-upped certain reasoning in the Wilder decision, including in the Rancho Palos Verdes decision about HHS enforcement. Because one of the things, not just looking at the text of the statute, but in what is now known as Kalevsky step two, one of the things that the court said in Wilder is said the possibility of HHS enforcement is not the kind of comprehensive enforcement scheme. And then the court cited that again in the Rancho Palos Verdes decision. And so, you know, the court has, I think, used that that reasoning in Wilder. That's the only reasoning that the Fourth Circuit cited below. We think that's good reasoning. But even if you think- even if you act like Wilder doesn't exist, we think it gets you to the same result in this case, because we're basing our argument on the requirements set out in Gonzaga and in Kalevsky. Just to go back to- I think the difficulty arises because of trying to draw the distinction between benefits and rights. And Gonzaga draws this line, and that's trying to make sense of prior precedent, and it's very elusive. And I think that's why there's a search for how can we draw the line. What guidance would you give us on how to do that going forward, or how to set out a principle that's not going to be just eye of the beholder? Right. So, rights-creating language confers an individual entitlement. It's for an individual, and it is a protection and entitlement to something. Benefits-language that addresses benefits or creates benefits, which is often policy or practice language, is aggregate language, like that refers to a policy or practice, that has an effect on-a beneficial effect on individuals, but it's not focused on protecting some particular right or entitlement of the individuals. And if we look at the language here, here's how we know that it's not a benefit, but protecting a right. It says that the individual may obtain care from any qualified and willing provider. So that stops the state from doing something. It's not just, oh, you know, you should have a list of a lot of providers and try to get as many providers as possible on the list. It's that Congress saw that there was a particular problem, you know, happening out in the world in terms of providers being excluded from Medicaid for, arbitrarily, same thing that's happening here, and the Congress said no to that. So it's the may obtain from any qualified and willing provider, any, which says that this is something that stops the state and this is something that has to be followed. To go back to the first part of your answer, something that's mandatory and is a benefit seems like a right. Or how would you distinguish a mandatory benefit from a right? So I would look to Gonzaga, for example. So you could have something that is mandatory, that was about educational privacy, like that you must have a policy or practice about individual consent for educational records, but that just isn't written in the circumstances of an individual being able to enforce a particular right. And so that was where there were individuals who were benefited by these policies that were required, but it wasn't saying an individual gets to do a particular thing, and the state has to protect that, and the state can't stop them from doing that. Well, just to follow up on that, Ms. Zaharsky, one can imagine a statute written as an individual benefit, it's mandatory on the states, but isn't a right creating, I mean, I think we can agree on that. Sure, I think there are a lot of provisions in the state plan requirements that are like that. They don't create rights. Right, so they focus on the individual and say that person is entitled or shall receive a benefit, but it could be limited to state compliance substantially with the overall scheme. I mean, that's an imaginable scenario. So I don't think that the language in the state plan requirements that has, there's no other place in the state plan requirements that says any individual may obtain like the language here. So once it focuses on the individual, I'm just trying to drill down on Justice Kavanaugh's bright line. Once it focuses on the individual and says you're entitled to some benefit, that's the line you'd have us draw. I think the court in Gonzaga and Tulesky set out three requirements. First, it has to be mandatory. Second, it has to be individual focused. And third, it has to use rights creating language. And we focused on what the, I think the dialogue, 100%, and I think that's where we're talking about an individual entitlement that the state has to provide something or that the state cannot do something to someone like no state shall, we talked about the discrimination language that's in like Title VI. What I'm trying to drill down on is it seems to me Congress could hypothetically say an individual should be entitled to these benefits, but not want to create a right of enforcement, but allow it to be subject to the state's overall substantial compliance with a larger rubric. I mean, that's imaginable, isn't it? The court, Congress could write statutes in a lot of different ways that would provide a benefit that would be not like the statute here. So let me just hone in on the particular thing at issue in this case. Let's say that it said a state plan shall include a policy to allow participants to choose their provider to the extent practicable. Well, I see the extent, but take that out. Then what? What would be the answer there? So I think in that case, if it talks about a policy, so Gonzaga suggested that that's more of an aggregate focus. And so I think the question would be, you know, to allow participants, that doesn't use the same, what we call rights creating language like may obtain from any. So we think the may obtain from any language is stronger. So a statute that says state shall create a policy that allows individuals to choose their doctors would not be a rights creating statute? I think it would be a more difficult case because it doesn't say the any qualified and willing provider. I just think that would be a potentially more difficult case. What if it did? What if it said state shall create a policy to allow individuals to pick a provider? Would that be rights creating? Well, it still doesn't say from any qualified and willing provider. And I think it's the any qualified and willing that makes clear that if a provider is medically qualified that the state can't take the provider out of Medicaid for a different reason, because that was the problem that Congress was addressing in the first place. But the point is, is that Congress has flexibility in how it writes statutes. It sometimes says in statutes like this provision does not create any individually enforceable rights. Well, that's a magic words requirement the other direction. It's not a magic, I don't think it makes sense. I respectfully suggest that this court should not think of it in terms of magic words. And in all of the court's cases that have required clear statements in other contexts, the court has said, look, it's not magic words. We don't tell Congress how to write statute. So it doesn't need to do that either. So okay. All right. I mean, that's the same thing that Judge Wilkinson said. He said, we're just trying to interpret what Congress did here. Like what, what were they, what were they focused on? What were they trying to do? Would they think that an individual could enforce this? Well, I don't know that it, I'm sorry, keep going. I don't think magic words is the proper term. It's just the, what words convey rights, unambiguously convey rights, creating language. And we take a step back and maybe this is what's the broader separation of powers concern. The broader separation of powers concern is Congress creates rights of action and remedies, not the court. And in Gonzaga, and that wasn't really the view in the seventies and eighties. And in Gonzaga, the court specifically linked this issue, this issue with the implied rights of action case law. And since Gonzaga in that other implied rights of action, we have really tightened up whether it's Bivens or otherwise and said essentially that far and no further. And I'm wondering how we should square Gonzaga's linkage of those two lines of cases. If we said something like that here, or how you think we should just deal with the fact that we no longer really engage in the process of creating implied rights of action or implying inferring rights of action, because we'd leave it to Congress. Okay. So this is not an implied right of action case, as you pointed out, because there is an express cause of action under section 1983. And we accept from Gonzaga and Teleski that where this court is, is that it is a high bar to find that Congress put in place an individually enforceable right. What we're saying is that this provision meets the bar. We don't think that there are a lot of others, if any, in the state plan requirements that would meet that high bar. But this language here, may obtain from any qualified and willing provider does. I mean, this is a very individual choice that Congress is trying to protect. It's individuals who are hurt. I don't think anyone disputes what this provision does that allows them to choose an individual Medicaid provider to choose from any qualified and willing provider. And I guess that just the thing I would say about how to write this, and I of course understand that the court wants to provide guidance. There's just different ways Congress could have said this, and they all get to the same place. So we have what Congress said here, any individual may obtain care from any qualified and willing provider. If it said any individual has a right to obtain care from any qualified and willing provider, it does the same thing. It's the exact same effect, like out in the world, in terms of placing the limitation on the state. It could also say, I think the state would agree, or maybe it used to agree, any individual has the freedom to choose from any qualified and willing provider. Or no person shall be denied the free choice of any qualified and willing provider. It's just, you know, Congress can write these in different ways. And you know, Judge Wilkinson said, I think very reasonably, we as the federal courts can't limit Congress to a thin thesaurus of our own design. And this court, of course, wants to provide guidance in terms of what the standard is in Tlaibski and in Gonzaga, but what we're telling you here is that this statute meets that requirement. And I might just speak briefly about the other state plan requirements, because I understand that the state has like raised this specter of how there are 86 other state plan requirements, and what if they're all individually enforceable, and there could be so much litigation. Before you get to that, would you agree with the proposition that what we need to find in order to say that a provision in spending laws legislation enables enforcement by a private party under 1983, something that's quite extraordinary, because the norm for — let's start out, we back up. Spending clause legislation is an agreement between the state and the federal government. Yeah, it's an offer the state can't refuse, but nevertheless, that's the form of it. And the standard mechanism for the enforcement of that is for the counterparty, the federal government, to take some action if the state doesn't meet up to its obligation. And the state, part of the obligation that may be imposed under spending clause legislation is something that is helpful in some way to an individual. Now, if we say whenever Congress uses the word individual, the suit can be brought under 1983, then all sorts of provisions could give rise to 1983 liability. So would you agree we need something that's out of the ordinary, that signals to the federal court, this is not just something that the state must do. This is something that allows the individual to go into court and get enforcement. Yes. Let me say three things about that. First, we don't think that just a mere reference to an individual gives an individually enforceable right. It's here. It's any individual may obtain from any qualified and willing provider. Two, we also don't think that the fact that it's a mandatory obligation on the states creates an individually enforceable right. Because as you pointed out, once the state agrees to the bargain, these are all things it has to do, even if it's just a policy or practice that benefits an individual. So just to make that, this is helpful. So individual is not enough. Mandatory is not enough. You need something more. And what is that more here that makes this really atypical, not typical? May obtain from any qualified and willing provider. That's the right screening language, the third ingredient that this court has talked about. The may obtain in this context, I think, is a natural way for Congress to talk about obtaining health care because you don't have to get it. It's just if you need health care, you may obtain it. I'm sorry. Go ahead. Well, I was just going to say, you know, there's a suggestion, I think, from the state that like may is not strong enough language, but may is used in a lot of contexts to reflect like a protected choice or a right. There are a lot of judicial review provisions, for example, like of the Federal Trade Commission orders or the SEC orders that say any person may obtain judicial review of such order by filing in a court of appeals. There's also may language used in the Constitution, which I think is pretty powerful. You know, the judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may from time to time ordain and establish. Now, that's a little bit different in that it's the power of Congress as opposed to rights creating language from an individual. But my point is just this idea that may is like too wimpy of language. I just don't think it's a good one. The problem is that Congress may well have had in mind, maybe it's likely that what they had in mind is simply that this is something that the state has to do, but not that this is something that allows an individual to sue in court. So don't we need something more than that? Well, there's the reference to the individual and there's an entitlement to the individual. And then we have on top of it what is called the suitor fix, which is Congress coming back to this court after the decision in suitor versus artist M and saying some of these plan requirements we expect will be individually enforceable. The fact that it's a state plan requirement doesn't make it not individually enforceable. So then the question is, you know, is this one of them? And that's where we get to, I think, the discussion of the other 80-some state plan requirements. Now, there have not been lawsuits to try to figure out whether all of these other requirements are individually enforceable because the vast majority of them obviously aren't. I think that the most that the state and the federal government suggests is that there are nine, eight or nine other provisions that, you know, one might look at to see are they sufficiently clear language that they could be individually enforceable. Most of them, like most of the other provisions, have been never litigated in the courts of  There are a few that have, but, you know, there has not been a flood of litigation here really under this provision or any of these other provisions. And, you know, this has been the longstanding position of the federal government. The first decision on this issue with this statute was, you know, Judge Sutton's opinion for the Sixth Circuit more than 20 years ago. Like, if the flood of lawsuits was supposed to happen, you know, we would expect to see it. And, you know, the only other thing I might say there is that I think it's wrong to suggest that, like, Medicaid, individuals on Medicaid are, like, you know, seeking to file lawsuits to try to get attorney's fees or some kind of financial benefit. They're not getting damages from the state under Section 1983. This court already has precedence, like, saying that that generally can't happen when a state official is acting in their individual capacity. What they're seeking is declaratory and injunctive relief. That's what all these cases that led to the circuit split are about, getting declaratory and injunctive relief when a state has, for reasons unrelated to medical competency, just kicked out a provider, and the individual said, you've denied me my right to a provider of choice, and I just want some health care. These aren't people getting rich. You know, they're just trying to get health care here. Ms. Zaharsky, can I ask you a question that kind of steps back to the legal standard? So I just want to put aside for a second whether you satisfy the standard. You have framed your argument in terms of Gonzaga and Tlebski, and I agree that those are the relevant cases. But, you know, Judge Richardson asked for help. I mean, I guess I feel like it's been clear that Blessing and Wilder have been eclipsed. Judge Richardson says, you know, can you please just explicitly say so. Do you agree that they've been explicitly eclipsed by Gonzaga and Tlebski, and do you have a problem with our just saying that? I mean, you've framed your argument in terms of Gonzaga and Tlebski, so just, you know. Right. To the extent the court thinks there should be additional clarity on that, the court absolutely should provide it, and we don't see an issue with the discussion that we've had here today about the way in which the court in Gonzaga said, look, if those decisions have been read a certain way, that is a wrong reading. Like, don't do that. So, you know, whether you would need to overrule Wilder or not, that provision is not even on the books anymore. Right. That seems like a bit much, particularly when there's pretty strong statutory stare decisis considerations. But certainly, the analysis set out in Gonzaga focuses on whether there's unambiguous conferral of an individual right, and to me, makes pretty clear, you can't just look at three factors in, you know, blessing. I entirely agree. I mean, so, and I agree that we're only talking about the analytical framework, that we're not talking about the results of particular cases. It just seems like it already was pretty clear, but maybe we should just say it, and it sounds like you're okay with that, saying Gonzaga and Tlebski are, set out the framework that we need to follow. Yes. I thought that was clear. If the court wants to make it more clear, that seems right. I think the Fourth Circuit here, like many of the other courts of appeals, Judge Wilkinson tried very hard to, like, trace this court's case law and talk about how those decisions had been limited. His analysis seemed right to us and was, you know, very careful in doing that, but to the extent that the court thinks that there needs to be more clarity here, please, you know, go ahead and provide it. Well, we could save him several pages, right, so he doesn't have to trace the case law. He can just cut straight to the chase. Sure. I think the one thing that we don't think the court should do is adopt some kind of magic words test. We just don't think that that's appropriate from a separation of powers perspective to Congress. It's not really fair to the Congress that, you know, wrote these statutes, and it, you know, it takes away from what the central inquiry, I think, is supposed to be here, which is, so Congress enacted a statute, and we're supposed to figure out, like, does it want individuals to be able to enforce that, and, you know, here, starting with what we call Tlebski Step 1, you know, we think it's pretty clear from this language that it confers rights on individuals. I mean, if it's not doing that, like, what is it doing? It clearly is giving individuals. We could say, say it again, what we said in Gonzaga and Tlebski, or we say, or we could say we meant it when we said it. Yes, although I don't think it's right to think that the courts of appeals aren't getting the message. I think they're getting the message, and let me just give you a few examples. First of all, you have Judge Wilkinson's opinion for the Fourth Circuit here, and he says many times, I understand that Gonzaga provides the test. I understand that it has to be unambiguous language. I understand that we cannot find individual rights in these statutes willy-nilly. We need to be absolutely sure about it, but all three of the judges on this panel, including the concurring Judge Richardson, found that this statute unambiguously confers individual rights, that it is guaranteeing an individual the right to their provider of choice, and then if you look at, you know, other cases, as I said, there haven't been a lot of cases where people have litigated provisions, other state plan requirements, but, you know, the courts of appeals have, like, routinely said, no, these things are not individually enforceable. We gave, you know, we gave one of them in our brief an example, you know, in Section A32, which is about paying only the provider and not third parties. You know, there are many other provisions, but if you're looking for some kind of, you know, issue here in the courts of appeals, like the courts of appeals aren't getting the message, you know, frankly, that's just not true. It's just that this is a situation where we're talking about an intensely personal right that Congress wanted to protect. I mean, there aren't that many things that are more important than, you know, being able to choose your doctor, the person that you see when you're at your most vulnerable, facing, you know, some of the most significant, you know, challenges to your life and your health, and Congress said a long time ago, you know, this is something we want to protect. We want people on Medicaid who are insured through Medicaid to have the same right that people who have private insurance enjoy because it's so foundational to individual dignity and individual autonomy, and it makes sense for Congress to have said that. I guess a couple other things that have been discussed that I just wanted to make sure that we address. You know, we understand that there needs to be clear notice provided to the states here about their end of the bargain, but, you know, as I said, I don't think that there's a disagreement about what this provision does. I think everyone agrees that it's, you know, you have the right to any qualified and willing provider. Now, the state has an argument that they think they have an unfettered right to define qualified as being something other than professional qualifications and medical qualifications. That is an argument that was made and rejected below in a long discussion by the Fourth Circuit. The court denied cert on that, but just to maybe give the court some confidence in the Fourth Circuit's decision, you know, if this were a case in which there were real question about medical competence, like is this provider qualified to be a medical provider in the state, the Fourth Circuit said, of course the state would get a healthy dose of deference in those circumstances. The Fourth Circuit said that multiple times in its opinion, but the Fourth Circuit also said, you know, this is an easy case. There has never been an argument through the long history of this litigation that Planned Parenthood is unqualified medically, professionally unqualified. It is only that there is something that Planned Parenthood is doing outside of Medicaid that the state wants to disqualify it from the program. And so if it were a real case about qualifications, you know, it's something where the state would get deference, but it's absolutely wrong under the scheme here to say that the state can just deem any requirement it wants, you know, that a provider is unqualified. Too many people who work at the provider have blue eyes or they support green energy or whatever else. I mean, Ms. Zaharsky, if every state thought that, right, we would have every state deciding what their various, you know, policy justification, you know, it could be people who do provide abortions, people who don't provide abortions, people who do provide contraception, people who don't provide contraception, people who do do gender transition treatment, people who don't. And, you know, every state could split up the world by providers like that, right? That does not seem what this statute is all about, is allowing states to do that and then giving individuals no ability to come back and say, that's wrong. I'm entitled to see my provider of choice regardless of what they think about contraception or abortion or gender transition treatment. That is absolutely right. I think if one accepted the full argument that the state makes, including on the question for which the court denied cert, it would be that a state can just say providers disqualified for any reason unrelated to medical competency, and that could cause a whole host of problems. But the main problem, as you identified, is that it would make the free choice of provider provision not mean anything. But isn't that the real problem here? Like, isn't that, I mean, if you really kind of boil down the dispute, the real problem is that Planned Parenthood was considered not a qualified provider. If you take it out of that, and, you know, there's a dispute about that, as you're saying with Justice Kagan, but if we take it out of that, that you've disqualified a provider because of non-Medicaid services that they provide, be it gender transition, contraception, abortion, whatever, that's a different issue, right? Then can you imagine if the state, in an area that we would all agree that the state gets a healthy dose of deference, like, let's say, you know, a doctor had malpracticed a certain number of malpractice suits or had violated, you know, standards in some other way. Does it make sense in that circumstance for plaintiffs to have a, for Congress to have wanted plaintiffs to have a right to come in and sue to say, well, you shouldn't, that's my provider of choice. He may have violated these standards, and then litigate the qualifications of that provider who might have been disqualified for reasons that are within the state's authority. Does it make sense that Congress would have wanted the patient to litigate that issue? Well, Congress wanted the patient to have the ability to see their provider of choice if it's a qualified and willing provider. And so that's the limitation that Congress put on the statute. And you know, as I said, if it were a case in which the state asserted that it was about a medical qualification, then the statute does say, you know, qualified to provide the services at issue, and so as the Fourth Circuit said, a court would interpret it, you know, what does that mean? It means professionally qualified, medically qualified. And in those circumstances, the state would get deference. But you know, those cases haven't arisen. That's not happening. And I think the reason for it, if I can just finish, is pretty simple, which is states aren't, for the most part, keeping needy patients away from qualified and willing providers. It's just not happening. Thank you, counsel. Justice Thomas? Justice Scalia? Justice O'Leary? I do want to have you address the substantial compliance issue. The other side says when it's a substantial compliance issue, that always brings everything into question as to whether a right was granted. That's the only way you could read that argument. But do you have another way to address it? And number two, Mr. Bursch said that you were wrong that providers could challenge this in their review mechanism. Could you explain why they can't? He says you were reading 126-400E wrong. So let me start with the substantial compliance question. I think the state's argument is wrong for three reasons. One, that is flatly inconsistent with Tlebsky, if you said that, because Tlebsky was also a substantial compliance regime. Two, it is inconsistent with Congress's judgment in the suitor fix, because those state plan provisions that Congress was saying could confer individual rights also all are substantial compliance provisions. And three, just to provide the reasoning for it, the question of substantial compliance is a different question from whether the statute creates a right. There is a right, and then there are mechanisms for enforcement of that right. Substantial compliance limits HHS's mechanism for enforcement. I think understandably, Congress said this is a blunt instrument where it's going to be cutting off health care to people that are saying that they denied health care. So we're only going to have HHS be able to do that in situations where they're not even in substantial compliance. But I think that shows that the 1983 remedy was expected here, because it would be a scalpel to that blunt instrument, a more tailored remedy to be able to say these people have been denied health care, and they can get that health care to get that declaratory and injunctive relief. So that's substantial compliance. The second is about enforcement proceedings. So I'll just say off the bat there, I think there is agreement that there is no individual enforcement proceeding that can challenge the denial of a provider of choice. There's only a claim denial proceeding that is available in a state administrative proceeding. But you asked about provider proceedings. So the statute itself, Medicaid, does not require the state to have a provider proceeding, but a federal regulation, so not a judgment by Congress, but federal law, a federal regulation does require that type of challenge, the state to have a procedure for the provider to challenge. The grounds of that are pretty limited to provider competency. As we discussed, you can look at the grounds in the provision that you mentioned. And here, the state admitted that that process was futile. And you don't just need to take my word for it. Both the District Court and the Court of Appeals found that on pages 101A, note four of the petition appendix is the Court of Appeals. And then the District Court petition appendix 137A to 138A, and this came after a colloquy that the state's lawyer had with the District Court who said, what is the hearing officer in the state procedure for the provider supposed to do here, because the governor has made this determination? Can they offer any relief? And the state attorney said no. And the only other thing I would say is, you know, I don't think it really matters whether the provider has a remedy here, because it's the individual's right that Congress was protecting. Congress wrote this in individual terms, because those are the folks that were denied, you know, health care when providers were cut out of Medicaid before this statute was enacted. And Congress said, you know, they're the ones being hurt, so we need to do something that, you know, allows them to be able to see their provider of choice. Thank you. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? On the alternative enforcement mechanism, though, we did say in Gonzaga that that is relevant, the fact that there is one buttresses the conclusion that those provisions fail to confer enforceable rights was the language in Gonzaga. So do you agree with that language? Well, I think there's a question about what buttress means. You know, this court explained it later in Tlefsky as there being step one and step two, and that explanation makes a lot of sense to me, because the first question is, look at the text at issue and does it confer a right? And then the way the court explains step two is, well, okay, so we have this right, but there's all these other ways of enforcing it, so we would have thought that those other ways of enforcing it make us think that there's not a section 1983 remedy. So, you know, I think the court explained those as separate in Tlefsky, and that seemed to be to be a correct clarification. I read, if you read all of the Gonzaga, you know, opinion together with the buttress language, you know, the court also does it in two steps. It says, you know, this language doesn't say anything about individuals. It's all about policy and practice. That's not going to create any rights. And then it says this buttress language, like, by the way, you've got this other problem, too, which is this like enforcement mechanism where there's a federal hearing board where an individual can go and get a hearing on their own particular complaint. So to me, that's kind of still the two step thing. I don't exactly know what buttress means, but I also don't really think it matters here because this is nothing like the Gonzaga ability to get, you know, a hearing before a federal hearing board where an individual can bring a suit. There's no individual cause of action. There's no individual administrative remedy. I mean, it's just so far away from, you know, see clamors in those cases that said, you know, there is enough of an enforcement scheme that means that there shouldn't be individual enforcement. Like, if this provision is not enforceable under section 1983, individuals, it's not going to be enforced. I mean, this provision will become meaningless. HHS has never cut off funding. Thank you. Justice Barrett? Justice Jackson? So let me just clarify that Congress adopted this provision in response to a specific problem. That's my understanding, which is that in the first two years of the Medicaid program, some states were trying to steer their Medicaid beneficiaries to certain providers and away from others. Is that your understanding of what the Congress was responding to when it enacted this provision? Yes. So to the extent that the state is arguing here that this provision is merely meant to serve as a directive to the secretary, I feel like that might be inconsistent with the understanding that the primary target of the statute was not the secretary. It was the states who were restricting people's rights or restricting people's choices of health care provider. Correct. It is like the statute at issue in Tulevski that it speaks both of the individuals who have the rights, the rights bearers, and the people that might infringe those rights, which in Tulevski was, you know, the nursing homes, and here is the state. So it has both components, the individuals who have the rights and the people that might not, you know, protect those rights, but it tells the state, you know, you have to protect this right to any qualified and willing provider. Thank you. Thank you, counsel. Rebuttal, Mr. Bursch? Thank you, Mr. Chairman. Thank you, Mr. Chief Justice. In the spending clause context, private rights are the exception, not the rule. That's why Congress must use explicit rights-creating language, words with a rights-creating pedigree. Justice Kavanaugh noted that the clear lines dissolve quickly if you don't require that explicit words, and this argument proves that. Justice Kagan started describing our provision as a right to choose a doctor. The word right doesn't appear in the statute. Justice Sotomayor at one point called it a privilege of choosing your doctor. The word privilege doesn't appear in the statute. Justice Jackson called it a free choice of provider provision. The words free and choice don't appear anywhere in the statute. My friend, Ms. Saharsky, said the provision is mandatory because the state must do these things. That's not what it says. It says that the plan must provide these things. In a substantial compliance context, that's a distinction that makes a difference. My friend also said twice that the statute would do the exact same thing if it used the word right, but that's absolutely wrong. If the statute said right, it would put the state on notice that it could be subjected to 1983 lawsuits. My friend also says that requiring explicit rights-creating language is a separation of powers problem. That's not correct. The absence of that language is a federalism problem because it doesn't give clear notice to the states. To the extent there's a separation of powers implication, it's because not requiring clear rights-creating language disperses the secretary's discretionary authority to federal district courts all across the country. A couple of quick points, our reply brief, pages 22 to 23 explain why the respondents are wrong about their understanding of regulation 16404. Page 22 gives the statutory citation that contemplates the provider administrative appeals and reply 23 explains that the administrative appeal remedy is not futile and our counsel did not admit that below. My friend admitted to Justice Gorsuch that a statute can require the provision of a benefit yet not have rights-creating language. That's this case. And the fact that the 12 of us can have such a robust conversation about whether this statute is mandatory or not, whether it's rights-creating or not, demonstrates that the rights-creating language is ambiguous, not clear and explicit. And if there is any ambiguity in this context, the state has to win because it's not being put on notice of when it might be sued. At the end of the day, putting states on clear notice requires explicit rights-creating language, as this court has said. Because the Any Qualified Provider provision lacks that language, we ask that you reverse. Thank you. Thank you, counsel. The case is submitted.